722 A.2d 680

**Donald W. FOGLE and Charlotte A. Fogle, Appellants,**

**v.**

**MALVERN COURTS, INC., Roger Buettner
and Joan Buettner, Appellees.**

Supreme Court of Pennsylvania.

Argued Oct. 21, 1998.

Decided Jan. 20, 1999.

Dante W. Renzulli, Exton, for Donald W. and Charlotte A. Fogle.

Marjorie A. Thomas, Wayne, for Malvern Courts, Inc. and Roger and Joan Buettner.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION OF THE COURT

FLAHERTY, Chief Justice.

This is an appeal by allowance from an order of Superior Court which reversed a summary judgment that the Court of Common Pleas of Chester County entered in favor of the appellants, Donald and Charlotte Fogle, in a case involving a dispute between neighbors as to who should pay for a fence constructed between their properties.

This controversy arose in 1995 when the Fogles announced that they would like to have a fence erected around their property and that they would expect their neighbors to share the costs of construction. At issue is whether the "Fence Law," 29 P.S. § 41, requires the neighbors to share such costs.

The parties alleged to be liable for sharing the cost of the fence, Roger and Joan Buettner, are residents of the town of Frazer in Chester County. They live in a neighborhood that consists mainly of single-family homes with some nearby commercial uses. Their lot consists of approximately 2.2 acres, and it partially surrounds the lot owned by the Fogles and borders it on two sides. Also alleged to be liable for sharing the cost of the fence is Malvern Courts, Inc., the owner of a mobile home park that borders another side of the Fogles' property. The lot owned by the Fogles contains their residence and consists of approximately 1.5 acres. The zoning district in which all of the parties' properties are located is residential, R–1, and the mobile home park is a lawful noncon- forming use.

The Fogles filed a petition pursuant to the Fence Law seeking a court order that the neighbors, i.e., the Buettners and Malvern Courts, Inc., pay an equal share of the cost of erecting a fence between the properties. The neighbors denied liability on the basis that the Fence Law does not apply to properties of the type involved in this case. The matter was submitted to the trial court on cross-motions for summary judgment, and judgment was entered in favor of the Fogles. An appeal to Superior Court followed, whereupon the judgment was reversed and the case was remanded for entry of judgment in favor of the neighbors.

In pertinent part, the Fence Law provides:

From and after the passage of this act, owners of improved and occupied land shall erect and maintain an equal part of all *line or division fences* between them, nor shall any such owner be relieved from liability under the provisions of this act except by the consent of the adjoining owner. And if any owner of such improved and occupied land shall fail or neglect to erect or maintain his, her, or their share of such line or division fence the party aggrieved shall notify the county surveyor ... whose duty it shall be to examine such line or division fence, so complained of; and if he finds said fence sufficient, the complainant shall pay the cost of his service; but if he finds such fence insufficient, he shall so report to a justice of the peace or alderman ... and said justice or alderman shall notify the delinquent owner of such improved and occupied land of the surveyor's report, and that his part of said fence, as found by the surveyor, be erected or repaired within forty days from the date of such notice; and if such notice be not complied with, the aggrieved party may cause said line or division fence to be erected or repaired, and the costs thereof collected, including the charge of the surveyor, from the delinquent owner ....

29 P.S. § 41 (emphasis added). The central issue in this appeal is whether the "line or division fences" to which this statute refers include fences of the sort contemplated by the

Fogles, namely fences in residential areas where single-family homes are the prevailing land use.

The Fence Law provides no definition of the terms "line fence" or "division fence." Incidental use of those terms has, however, been made in our decisions when there has been occasion to refer to fences that are on property lines or that mark a division between areas of land. In such cases the terms were used en passant, and their meanings for purposes of the Fence Law were not in dispute. See *Shinn v. Rosenberger*, 347 Pa. 504, 508, 32 A.2d 747, 749 (1943) (line fence between farms); *Reiter v. McJunkin*, 173 Pa. 82, 84, 33 A. 1012, 1012 (1896) (division or line fence between farms); *Davidheiser v. Rhodes*, 133 Pa. 226, 233, 19 A. 400, 401 (1890) (division fence on farm). The most common use of the terms has been with regard to fences on farmland. E.g., *id.* Our use of the terms has not always been limited to the context of farmland, however, for we have on certain occasions used them to refer to fences on urban property. E.g., *Neilson v. Hummel*, 280 Pa. 483, 485, 124 A. 642, 642 (1924) (line fence between urban dwellings). Similarly, in statutes that are distinct from the Fence Law, the legislature has used the term "division fence" to refer to a fence on the boundary line of an urban or suburban dwelling lot. 53 P.S. §§ 15173–15176 (building regulations governing division fences in cities of the first class); 53 P.S. § 37403(12) (regulation of division fences in cities of the third class).

In a strict sense, however, a "line fence" is defined as "a fence built along the boundary or property line of a farm or ranch." Webster's Third New International Dictionary (unabridged 1976). A "division fence" is defined as "a fence separating adjacent areas of the same farm or ranch—distinguished from line fence." *Id.* We believe the legislature employed the terms in the Fence Law in accord with their prevailing usage, to wit, in keeping with their common and ordinary meanings as set forth in the dictionary. Indeed, the Statutory Construction Act provides in 1 Pa.C.S. § 1903(a) that "[w]ords and phrases shall be construed according to rules of grammar and *according to their common and ap-*

*proved usage ....*" We have generally used dictionaries as source material for determining the common and approved usage of a term. *Love v. City of Philadelphia,* 518 Pa. 370, 374, 543 A.2d 531, 532 (1988). Such an approach leads to the conclusion that the fences to which the Fence Law applies are those on farms or ranches.

Even assuming, however, that the terms are ambiguous, i.e., that their meanings can be limited to the farm and ranch context or that they can be construed more broadly to include fences on urban or suburban property, the rules of statutory construction lead to the conclusion that the former is the correct interpretation. See *Commonwealth v. Dickerson,* 533 Pa. 294, 300, 621 A.2d 990, 993 (1993) ("[W]hen a statute is not entirely free of ambiguity, we are subject to the rules of statutory construction enacted by the legislature."). Those rules permit consideration of the occasion and necessity for the statute, the object to be attained, and former laws on the same subject. 1 Pa.C.S. § 1921(c). Here, upon examination of the history and purposes of the Fence Law, it becomes clear that the intent of the legislature was to provide for the containment of livestock that might otherwise do damage to neighboring properties.

The decision of Superior Court aptly described the history of the fence law as follows:

> During the eighteenth and nineteenth centuries, almost every landowner kept some form of livestock on his property and the common law did not require such landowners to fence their land in the absence of an agreement between the adjoining owners. See R. Powell, *The Law of Real Property,* § 693 (1989). However, the common law did encourage landowners to fence their properties by applying the rule of strict liability for any damages caused by their animals if they trespassed onto another's land. See W. Keeton, Prosser and Keeton, *The Law of Torts,* § 76 (5th ed.1984). Eventually, many states, including Pennsylvania, enacted laws combining a duty to fence with the concept of strict liability to create a firm set of rules which would prevent disputes concerning the liability for damages to crops or

other property caused by livestock. Specifically, the only discernible purpose of Pennsylvania's Fence Law has been to resolve disputes .involving trespassing livestock. This purpose is indicated in the preamble of the first such law:

> For preventing all disputes and differences that may arise through the neglect or insufficiency of fences in this province and counties annexed, *Be it enacted,* that all cornfields and grounds kept for enclosures ... shall be well fenced ....

1700 Pa. Laws 13, § 1.

701 A.2d at 267.

Similarly, we described the history and purposes of various statutory predecessors of the current Fence Law in *Barber v. Mensch,* 157 Pa. 390, 27 A. 708 (1893). We explained that the statutes were intended to assure the containment of livestock:

> The first section of the Fence Act of 1700 directs: "That all cornfields and grounds kept for inclosures within the said province and counties annexed, shall be well fenced with fence at least five feet high, of sufficient rail or logs, and close at the bottom. And whosoever, not having their ground inclosed with such sufficient fence as aforesaid, shall hurt, kill, or do damage to any horse, kine, sheep, hogs or goats of any other persons, by hunting or driving them out of or from said grounds, shall be liable to make good all damages sustained thereby to the owner of the said cattle."
>
> The effect of this was to compel every landowner to defend his crops against his neighbor's cattle by constructing a sufficient fence; he must fence them out. It changed the rule of the common law, which held the owner liable for all damage done to others by his cattle, and thereafter restricted his liability to only such damage as was done by them where a "sufficient" fence had been built by the owner of the land, as required by law.
>
> Then came the act of 1842, the third section of which provided: "When any two persons shall improve land adjacent to each other, or where any person shall inclose any land adjoining to another's land already fenced in, so that

any part of the first person's fence becomes the partition between them, in both these cases the charge of such division fence, so far as is inclosed on both sides, shall be equally borne and maintained by both parties." Then followed provisions for view by township auditors whose duty it was to determine the sufficiency of the fence . . . .

. . . There has never been a time, since man earned his bread by cultivating the ground, that some sort of an artificial separation, defining the limit of right of adjoining owners, has not been recognized as needful . . . .

But the act of 1842 was passed when the requirements of the act of 1700, as to the sufficiency of a fence, were in force, one that would bar cattle out . . . .

The question then is, what was the effect on the act of 1842 of the act of 1889, which repealed the first section of the act of 1700?

By the repeal, the rights of landowners and owners of cattle are left as they were at common law before 1700. That is, the owner of cattle must now fence them in, or he is answerable in damages for their trespasses . . . . Before the repeal, the complaining plaintiff, to recover, must show that he had maintained a "sufficient" fence, for it was his duty to fence out; since the repeal, the responding defendant, the owner of the cattle, must show, to prevent a recovery, that he, by a "sufficient" fence kept them in or tried to . . . . The question to be put to him, is: Under that act, did you construct a division fence sufficient to keep your cattle off your neighbor? If you did not, you must answer in damages; and this without regard to the liability for the cost of a division fence. It was his duty to have a sufficient fence, whether his neighbor built one or half of one. If he wanted his neighbor to share with him the cost, the method of enforcing contribution is yet plainly pointed out to him in the act of 1842.

157 Pa. at 395–98, 27 A. at 709–10. Hence, even in their earliest forms, fence laws had as their objective the contain-

ment of livestock and the protection of crops.[1]

This conclusion is reinforced by the statutes' references to the "sufficiency" of fences. As did the laws described in *Barber v. Mensch*, supra, the present statute provides that the fence between adjoining landowners, the cost of which is to be collected in part from the neighboring owner, must be a "sufficient" one. For the fence to be sufficient, it must be adequate for its intended purpose. There being no other discernible purpose than the containment of livestock, the term "sufficient" must have been used by the legislature to describe a fence in the context of ranch or farm property, i.e., a fence that was sufficient to prevent livestock from straying onto neighboring properties.

In short, the Fence Law addresses the sharing of costs for fences constructed on farms and ranches. It does not apply to single-family residential neighborhoods in typical urban or suburban settings, where the containment of livestock is not a concern. Superior Court properly held, therefore, that the Fence Law is inapplicable to properties of the type presented here.[2]

Order affirmed.

---

1.  Most of the cases litigated under early versions of the fence laws dealt with liability for trespassing livestock. See *Barber v. Mensch,* supra; *Milligan v. Wehinger,* 68 Pa. 235 (1871); *Rangler v. McCreight,* 27 Pa. 95 (1856); *Hall v. Kreider,* 55 Pa.Super. 483 (1913).

2.  None of the parties to this controversy maintains livestock on their grounds.