In Re: Notice of Appeal from TOWN-
SHIP OF BRADFORD, Township
Zoning Hearing Board,

86 Rear Hedgehog Lane Tax
Parcel 17.030.101–00.

Appeal of: New Century Pipeline,
a Pennsylvania General

**Partnership.**

Commonwealth Court of Pennsylvania.

Argued Sept. 16, 2011.

Decided May 9, 2012.

Matthew L. Wolford, Erie, for appellant.

Gregory A. Henry, Bradford, for appellee.

BEFORE: COHN JUBELIRER, Judge, and LEAVITT, Judge, and BROBSON, Judge (P.).

OPINION BY Judge LEAVITT.

New Century Pipeline (New Century) appeals an order of the Court of Common Pleas of McKean County (trial court) affirming a decision of the Bradford Township Zoning Hearing Board (Board) that New Century's compressor station, located where natural gas emerges from the wellhead, is not a use permitted in the Forest/Slope Residence District (Forest District). The Bradford Township Zoning Ordinance (Zoning Ordinance)[1] permits oil and gas production in the Forest District and allows the installation of equipment necessary to drilling and pumping operations. Without a compressor station, the gas collected at New Century's wellhead cannot be placed into a pipeline and moved from the site. Accordingly, New Century argues that its compressor station is equipment necessary to its gas production. We agree and reverse.

On August 7, 2009, the Bradford Township Zoning Officer (Zoning Officer) issued an enforcement notice to New Century, charging it with a violation of Section 200.1.A.(8) of the Zoning Ordinance. Section 200.1.A.(8) states, in relevant part, as follows:

1. ORD. 1983–2B, April 20, 1984, *as amended,* entitled ZONING ORDINANCE OF THE TOWNSHIP OF BRADFORD, PENNSYLVANIA.

*§ 200. Forest/Slope Residence Districts.* This district is designed to protect areas in the Township, particularly those areas of steep slopes, for the preservation and conservation of the natural environment; to minimize soil erosion; to permit and encourage the retention of forested land; and to permit non-intensive land uses that constitute a harmonious and appropriate use in selected areas of the Township.

 1. *Permitted Uses and Structures—*

  A. *Principal Uses—*

    ✳  ✳  ✳

  (8) *oil and gas production, including equipment necessary to drilling or pumping operations,* but not including the construction or alteration of new or existing storage, service or repair buildings. Such producer shall acquire the proper permits and approvals from the State Department of Environmental Resources and file such with the Zoning Officer.

ZONING ORDINANCE § 200.1.A.(8) (emphasis added); Reproduced Record at 199a (R.R. ——). In addition to permitting the principal uses of oil and gas production, the ZONING ORDINANCE permits uses accessory thereto. ZONING ORDINANCE § 200.1.B.(1). An accessory use is defined as one "customarily incidental and subordinate to the principal use . . . located on [the] same lot" with the principal use. ZONING ORDINANCE § 1110; R.R. 210a.

New Century's gas pumping operation drills and pumps for shallow gas; it does not conduct hydraulic fracturing or "fracking." Adjacent to the actual pump is a small compressor and stripper station, which purifies the natural gas before placing it in a pipeline for movement from the site. The Zoning Officer's enforcement notice asserted that New Century's compressor station was not equipment "necessary to drilling or pumping operations" and was not incidental to a gas pumping operation. The Township contended that the compressor station was *processing* gas, and "oil and gas refining, processing, storage and transmission" can only be done in the Township's General Manufacturing District. ZONING ORDINANCE § 410.1.A.(3); R.R. 209a. New Century defended that without the compressor station, it could not move its gas from the wellhead. Accordingly, it was equipment necessary to gas production or, alternatively, a permitted accessory use.

At the hearing on the enforcement notice, the Township submitted several photographs of New Century's gas production facility. The photographs show the well itself, which is a single steel pipe much shorter than the surrounding trees, together with a generator, a small storage tank and the compressor station, which is under a tarpaulin. Arranged together, the equipment appears to have a footprint approximately the size of a two-car garage. Nearby is a shed used for storage and a 19,000 gallon storage tank, which is surrounded by a protective fence and warning signs.

William Woodring, who lives nearby, testified for the Township. Before retiring, Woodring worked for 31 years as a fire chief at an oil refinery. Woodring acknowledged that he had never operated a compressor station and had never worked on a gas operation such as New Century's. Nevertheless, Woodring was accepted as an expert qualified to testify about the oil and gas industry.

Woodring explained New Century's compressor station. The generator operates the compressor station, which strips butane and propane from the gas that arrives at the wellhead and pressurizes it into a liquid form. These liquified byprod-

ucts are then piped underground to the 19,000 gallon storage tank. By removing propane and butane, the compressor station purifies the natural gas, so that it can be placed into a pipeline. Woodring opined that gas production involves taking the gas from the ground; it does not include the work of the compressor station, which is a separate processing operation.

On cross-examination, Woodring acknowledged that propane is an ingredient of natural gas that is heavier than natural gas and butane is an ingredient that is lighter than the natural gas, *i.e.*, a light-end product. Nevertheless, he emphasized his view that the production ends when the oil or gas emerges from the ground.

Jack Carnes, the Zoning Officer, also testified. He reiterated that oil and gas production is permitted in the Forest District, but oil and gas processing are not permitted. Rather, oil and gas refining, processing, storage and transmission must be done in the Manufacturing District. He then turned to Section 1110 of the Zoning Ordinance, which defines a building as "a combination of any materials, whether portable or fixed, having a roof, to form a structure affording shelter for persons, animals or property." ZONING ORDINANCE § 1110; R.R. 210a. He believed that the compressor station was a prohibited service "building" because it is covered by a tarpaulin roof stretched over metal poles to shelter the compressor equipment. The Zoning Ordinance does not allow storage, service or repair buildings in the Forest District.

In response, New Century presented the testimony of Charles G. Lang, a professional land surveyor, who has worked for 15 oil and gas companies. Within the County, he has seen six facilities similar to New Century's, including two in Bradford Township that use compressor stations.

Lang's testimony was offered to show that compressor stations are customary and, thus, accessory to a gas pumping operation.

New Century next called Vincent Aiello, the supervisor and operator of the compressor station at issue. He explained that the compressor station consists of two machines, a compressor and a stripper, that are connected by a pipe. The station is covered with a tarp to protect the electrical equipment and is mounted on a skid, not on the ground.

The compressor station increases the pressure on the gas stream to remove water, propane and butane. This process takes the stripped natural gas to the appropriate British Thermal Unit (BTU) level, which must be done in order to place the gas into a pipeline and move it from the well. The liquid byproducts are piped to the 19,000 gallon holding tank and from there they are transported by truck for refining in Warren, Pennsylvania.

R. James Barnes, an oil and gas operator, also testified for New Century. He has operated over 1800 oil and gas wells and 40 "compressor sites" in Pennsylvania. R.R. 128a. He explained that generally gas recovered at the wellhead runs at 1350 BTUs. To go into a pipeline, the gas must run at 1000 BTUs. To remove 350 BTUs, moisture is removed from the gas stream and then filtered; otherwise, the natural gas is not marketable. Barnes estimated that there are approximately 75 compressor stations used at various gas pumping operations in the area. Without stripping, the gas brought to the wellhead has no value. He opined that the compressor station is an essential part of a gas pumping operation. When asked about the meaning of "process," he agreed that "process is a term that refers to either chemical or physical changes in the thing acted upon." R.R. 138a. He also agreed that

[p]ropane is produced as a byproduct of two other processes. The processing of natural gas involves removal of butane, propane and large amounts of methane from the raw gas in order to prevent condensation of these volatiles in natural gas pipelines.

Supplemental Reproduced Record at 37a; Notes of Testimony, October 5, 2009, at 60. Barnes acknowledged that there are markets where higher BTU gas is marketable. For example, the Minard Run Oil Company has a line that feeds a plant at Zippo Manufacturing Company, which burns higher BTU gas. The gas does not have to be compressed or stripped because it is used as it comes out of the ground.

The Board held that the compressor station, located on the property since November 2008, was a building because the compression equipment was covered by a roof. Crediting Woodring's testimony, the Board found that the compressor was not involved in the production of gas but in its processing. The Board held that New Century's compressor station violated the Zoning Ordinance because (1) it was an unauthorized building and (2) it was processing gas, an activity that can only take place in the Manufacturing District. The Board ordered New Century to remove the compressor station.

New Century appealed. The trial court heard oral argument on the appeal, but it denied New Century's request for an evidentiary hearing. The trial court affirmed the Board.

The trial court rejected the Board's holding that the compressor station was a building because it was covered with a tarpaulin. The trial court determined it was a reach to call anything covered with a tarpaulin a "building." The trial court observed that a tarpaulin did not make the compressor a building any more than a tarpaulin cover makes a backyard grill or car a "building." The Township has not challenged this aspect of the trial court's holding.

On the other hand, the trial court affirmed the Board's construction of Section 200.1.A.(8) of the Zoning Ordinance. "Processing" or "production" are critical terms in Sections 200.1.A.(8) and 410.1.A.(3) of the Zoning Ordinance, but they are not defined. The Statutory Construction Act of 1972 explains that words should be construed "according to their common and approved usage" unless they are technical terms. 1 Pa.C.S. § 1903(a).[2] The trial court looked to *Black's Law Dictionary* 1245 (8th ed.2004), which defines "produce" as follows: "[t]o bring (oil, etc.) to the surface of the earth." Using the definition of "produce," which is a verb, the trial court construed the noun "production" to mean the extraction of gas from underground to the earth's surface. The trial court looked to a general dictionary definition for "process," which is defined as

a series of actions or operations conducing to an end; especially: a continuous operation or treatment especially in manufacture.

Trial Court Opinion at 4 (citing *Merriam–Webster Online Dictionary* (2010)). Finally, the trial court also looked to case law stating that "[p]rocessing is a flexible term

---

**2.** Section 1903 provides in full:

    (a) Words and phrases shall be construed according to rules of grammar and according to their common and approved usage; but technical words and phrases and such others as have acquired a peculiar and appropriate meaning or are defined in this part, shall be construed according to such peculiar and appropriate meaning or definition.

    (b) General words shall be construed to take their meanings and be restricted by preceding particular words.

1 Pa.C.S. § 1903.

and it may refer to either chemical or physical changes in the thing acted upon." *Gulf Oil Corporation v. City of Philadelphia*, 357 Pa. 101, 111, 53 A.2d 250, 255 (1947).

■ The trial court concluded that New Century's compressor station was processing gas because it was a step taken after the gas had moved a few feet from the wellhead, and it effected a chemical change on the thing acted upon, *i.e.*, the natural gas. The trial court affirmed the Board, and New Century appealed.[3]

In its appeal to this Court, New Century raises a number of issues. Its central issue is that its compressor station is a permitted principal use under Section 200.1.A.(8) of the Zoning Ordinance or, alternatively, a permitted accessory use. New Century also argues that if the Zoning Ordinance does prohibit compressor stations, then it violates Section 603.1 of the Municipalities Planning Code, 53 P.S. § 10603.1;[4] impermissibly excludes gas production in the Township; and is preempted by state statute. Finally, New Century contends that the trial court erred in denying its motion for an evidentiary hearing.

■ We begin with the central issue of whether the compressor station is equipment necessary to gas production and, thus, permitted under Section 200.1.A.(8) of the Zoning Ordinance. New Century argues that the Board erred because it did not construe the words in the Zoning Ordinance according to their common usage and that the trial court erred in relying upon *Black's Law Dictionary*. New Century also argues that the focus of the Board and trial court was too narrow in scope, thereby yielding a result that would require it to close down its gas pumping operation.

New Century explains that the edition of *Black's Law Dictionary* used by the trial court does not define "production." It only defines "produce." However, an earlier edition, *Black's Law Dictionary* 1209 (6th ed.1990), which was in use when oil and gas production was added to the Zoning Ordinance in 1991, defines both "produce" and "production." It defines "produce" as "[t]o make, originate, or yield, as gasoline. To bring to the surface, as oil." *Id.* It defines "production" as a "[p]rocess or act of producing. That which is produced or made; *i.e.* goods." *Id.* In short, the 1990 edition of *Black's Law Dictionary* offers a broader meaning of production, which includes processing, and effectively makes the two words interchangeable. This defeats the Township's strained premise that there is a chasm between production and processing.

New Century also explains that the Township's argument is an exercise in semantics because oil and gas production involves a number of "processes." Applying for a permit is a process; drilling is a process; casing is a process; hydraulic fracturing is a process; pumping is a process; storing fluids is a process; separating oil and water is a process; transporting oil and gas is a process; and conditioning gas to a marketable standard is a process. It does not make any sense to find all of the above "processes" to be

---

3. Where the trial court has not taken additional evidence, our scope of review concerns whether or not the Board abused its discretion or committed an error of law. *Callowhill Center Associates, LLC v. Zoning Board of Adjustment*, 2 A.3d 802, 806 n. 3 (Pa.Cmwlth. 2010).

4. Act of July 31, 1968, P.L. 805, *as amended*, added by the Act of December 21, 1988, P.L. 1329, 53 P.S. § 10603.1.

production, except for the conditioning of the gas.

In any case, New Century argues that courts do not look to *Black's Law Dictionary* for a common usage analysis but, rather, general dictionaries. In support, New Century points to *Huntley & Huntley, Inc. v. Borough Council of the Borough of Oakmont*, 600 Pa. 207, 222, 964 A.2d 855, 864 (2009) (relying on *Random House Webster's College Dictionary)* and *Patricca v. Zoning Board of Adjustment of the City of Pittsburgh*, 527 Pa. 267, 275, 590 A.2d 744, 748 (1991) (relying on *Webster's Ninth New Collegiate Dictionary).* Even so, New Century argues that the dictionary has limited utility because it defines single words, not phrases. "Produce" and "process" should be considered within the technical use of "oil and gas production" and "oil and gas processing." New Century contends that its evidence established the technical meaning and usage of these phrases.

The Township counters that New Century's argument is contrary to the analysis of our Supreme Court in *Kilmer v. Elexco Land Services, Inc.*, 605 Pa. 413, 990 A.2d 1147 (2010), and *Gulf Oil Corporation v. City of Philadelphia*, 357 Pa. 101, 53 A.2d 250 (1947). Further, the Board credited Woodring's testimony that there was a technical distinction between oil and gas processing and oil and gas production, which settled the meaning of the Zoning Ordinance.

The defining issue is the meaning of "oil and gas production, including equipment necessary to drilling or pumping operations," as used in Section 200.1.A.(8) of the Zoning Ordinance. The activity of drilling or pumping requires the "proper permits and approvals" of the Department of Environmental Protection (DEP). *Id.* The evidence is uncontroverted that without the compressor station, New Century's gas at the wellhead is useless, except, perhaps, for flaring and roasting marshmallows. The compressor station has been specifically permitted by DEP. The fixation on single words has perverted a logical construction of Section 200.1.A.(8) of the Zoning Ordinance.

Certainly, dictionaries are an important source material for determining the "common and approved usage of a term." *Fogle v. Malvern Courts, Inc.*, 554 Pa. 633, 637, 722 A.2d 680, 682 (1999). The dictionary defines *"[p]reduction "* as "something that is produced naturally or as the result of labor and effort" and as *"the act or process of producing,* bringing forth, or making" and "the total output of a commodity." *Webster's Third New International Dictionary* at 1810 (2002) (emphasis added). It defines "process" or "processing" as subjecting an item to "a particular method, system, or technique of preparation, handling, or other treatment designed to effect a particular result" and "to prepare for market, manufacture, or other commercial use by subjecting to some process." *Id.* at 1808. New Century's compressor station satisfies the definitions of "production" and "processing." The dictionary has limited utility.

The Township's expert, Woodring, testified that the production of oil and gas involves taking it from the ground and stops at the wellhead. However, he also testified as follows:

> *[i]t's a process.* You know, *the process is they are producing a finished product,* but processing a product. Producing—production, when it comes out of the ground and then when you process it, we refer to that as production in the refinery, by our inventories and stuff, but it's a process.

R.R. 22a–23a (emphasis added). This explanation is not very clear. Woodring's conclusion about the difference between

production and processing must also be considered in light of his frank admission that he knew nothing about how to "send [gas] somewhere to get processed." R.R. 24a.

New Century's expert, Barnes, testified that oil and gas at the wellhead generally runs at 1350 BTUs and that this level must be reduced in order to sell the gas. His testimony was confirmed by Aiello. Equipment required to filter, dehydrate and compress the gas to move it from the wellhead is necessary to the "gas pumping operations." Barnes was not refuted.

Barnes explained that when crude oil comes out of the ground, it must be heated to separate and remove the water in the oil. The waterless oil is then placed in a storage tank until it can be moved to a refinery. The process with gas is similar. The compressor station increases the pressure of the gas to strip it of propane, butane and water. This decreases the BTUs, so that the gas achieves pipeline quality. If New Century does not do this, its gas cannot be moved from the wellhead, which is necessary if it is to be sold. Barnes concluded that the compressor station

> is a production tool that we need, A, to produce our gas in this field and move it to market. So without this tool, we don't have a sellable product ... my customers who use this tool have to have it to make money.

R.R. 133a–134a. Stated otherwise, without stripping the gas, "[y]ou wouldn't have any production. Without moving the product as a conditioned product, the wells have no value." R.R. 135a.

New Century also presented evidence showing that the Department of Environmental Protection considers the compressor station to be a production tool and, for that reason, required New Century to obtain a permit. The permit itself stated as follows:

> A natural gas, coal bed methane or gob *gas production* or recovery facility *may include internal combustion (compressor) engines,* gas dehydration units, crude oil and brine storage tanks, vents and other equipment associated with this activity.

R.R. 43a (emphasis added). The United States Environmental Protection Agency defines

> *facilities in the oil and natural gas production source category [to] include,* but are not limited to, well sites, satellite tank batteries, central tank batteries, *a compressor station* that transports natural gas to a natural gas processing plant, and natural gas processing plants.

40 C.F.R. § 63.761 (emphasis added).

Woodring's testimony was credited, and it is the Board's job to determine the credibility of the witnesses and to assign the weight to be given the evidence. *Pennsy Supply, Inc. v. Zoning Hearing Board of Dorrance Township,* 987 A.2d 1243, 1248 (Pa.Cmwlth.2009) (quoting *Borough of Youngsville v. Zoning Hearing Board of the Borough of Youngsville,* 69 Pa.Cmwlth. 282, 450 A.2d 1086, 1089 (1982)). However, Woodring's testimony was inadequate to prove that the compressor was not equipment necessary to New Century's "gas pumping operations." Woodring could not explain how the gas could be moved from the wellhead without the compressor station. Indeed, he conceded that he had no knowledge about that matter. Woodring merely reiterated the narrow view of the word "production" offered by the Township. He did not offer testimony to refute the technical meaning of the word "production" offered by New Century's witnesses, documents and environmental regulations.

We turn, then, to *Kilmer* and *Gulf Oil*, which the Township believes to be dispositive of its interpretation of the word "processing." We disagree that they are either dispositive or instructive on the meaning of Section 200.1.A.(8).

*Kilmer*, 605 Pa. 413, 990 A.2d 1147, involved a dispute over the calculation of royalties owed to landowners for their oil and natural gas. The dispute centered on whether the royalties were to be calculated on the value of the gas at the wellhead or at the point of retail sale. The Supreme Court concluded that it was to be based on the value at the wellhead. The case was a contract matter, not a case of statutory interpretation. The Township seizes upon the following passage:

> The term royalty has been defined in the oil and gas industry as "[t]he landowner's share of production, free of expenses of production." Howard R. Williams & Charles J. Myers, Manual of Oil and Gas Terms § R (Patrick H. Martin & Bruce M. Kramer eds., 2009). In the industry, as referenced above, the *"expenses of production" relate to the costs of drilling the well and getting the product to the surface, but do not encompass the costs of getting the product from the wellhead to the point of sale,* as those costs are termed "post-production costs." "Although the royalty is not subject to costs of production, usually it is subject to costs incurred after production, e.g., production or gathering taxes, costs of treatment of the product to render it marketable, costs of transportation to market."

*Kilmer*, 605 Pa. at 429, 990 A.2d at 1157. The Township argues that *Kilmer* established that "drilling" is synonymous with "production," and that anything that happens after the gas arrives at the wellhead is "post-production." We disagree.

First, *Kilmer* involved a contract that allowed the gas company to deduct the expense of production from its royalty payment. In that context, the Supreme Court drew the line between production and post-production. Second, there is nothing in the *Kilmer* record to suggest that there was not some "processing," such as the removal of water to which Barnes testified. Stripping is "production," which takes place at the wellhead, not at the point of sale. In sum, *Kilmer* is not instructive on Section 200.1.A.(8) of the Zoning Ordinance.

*Gulf Oil*, 357 Pa. 101, 53 A.2d 250, is also inapposite. At issue there was a real estate tax assessment of the company's oil refinery tanks. Gulf Oil argued that its tanks were exempt because they constituted machinery used in manufacturing. The City of Philadelphia argued that because the tanks did not apply force or motion to the product, they were not machinery. The Supreme Court rejected this argument, holding that static and moving equipment were both "machinery." In passing, the Supreme Court discussed the meaning of "processing" and held that it "is a flexible term and it may refer to either chemical or physical changes in the thing acted upon." *Gulf Oil*, 357 Pa. at 111, 53 A.2d at 255. We agree that "processing" is a flexible term, but so are "production" and "gas pumping operations." *Gulf Oil*, a 1947 tax case, is not instructive on the interpretation of the Zoning Ordinance.

Section 603.1 of the Municipalities Planning Code, 53 P.S. § 10603.1, provides that when interpreting a zoning ordinance, "the language shall be interpreted, where doubt exists as to the intended meaning of the language written and enacted by the governing body, in favor of the property owner and against any implied extension of the restriction." *Id.* To the extent a doubt

exists that the Zoning Ordinance prohibits the use of a compressor station in the Forest District, Section 200.1.A.(8) must be construed in New Century's favor.

In sum, we hold that operation of the compressor station is "gas production," as that term is used in Section 200.1.A.(8), and, as such, a permitted use. Any other interpretation makes "gas production, including equipment necessary to drilling or pumping operations" impermissible, which contradicts the Zoning Ordinance's express authorization of gas production in the Forest District.

We reverse the trial court.[5]

### ORDER

AND NOW, this 9th day of May, 2012, the order of the Court of Common Pleas of McKean County entered June 18, 2010, in the above-captioned matter is hereby REVERSED.

---

5. Because we reverse, we will not address the remaining issues raised by New Century.